**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
In re:                                                                Chapter 11

Petroleum Kings, LLC,                                        Case No. 17-22154 (RDD)

                        Debtor
-----------------------------------------------------------x
United Metro Energy Corporation,

                        Plaintiff

            v.                                                        Adv. P. No. 17-08211 (RDD)

Petroleum Kings, LLC,
Asmel Gonzalez a/k/a Mel Gonzalez, and
"John Doe No. 1" through "John Doe No. 10,"

                        Defendants
-----------------------------------------------------------x
Petroleum Kings, LLC,

                        Plaintiff

            v.                                                        Adv. P. No. 17-08212 (RDD)

United Metro Energy Corp. and United Apollo
Petroleum Transportation Corp.,

                        Defendants
-----------------------------------------------------------x

APPEARANCES:

Counsel:        Kramer, Levin, Naftalis & Frankel LLP, by Jonathan Wagner, Esq. for United
                Metro Energy Corporation and United Apollo Petroleum Transportation
                Corporation

                Lachtman Cohen P.C., by Clifford Bond, Esq., and Penachio Malara, LLP, by
                Anne Penachio, Esq. for Petroleum Kings, LLC and Asmel Gonzalez

## MEMORANDUM OF DECISION AFTER TRIAL[1]

Hon. Robert D. Drain, United States Bankruptcy Judge

      This is a dispute between the debtor and debtor in possession herein, Petroleum Kings, LLC ("PK" or the "Debtor") and its principal, Asmel Gonzalez ("Gonzalez"), on the one hand, and United Metro Energy Corporation ("UMEC") and UMEC's corporate parent, United Apollo Petroleum Transportation Corporation ("Apollo"), on the other, over whether PK and Gonzalez are liable for the improper "lifting" of several hundred thousand gallons of fuel oil from UMEC without payment and PK's related claims against UMEC for defamation and against UMEC and Apollo for PK's delivery of UMEC oil to UMEC and Apollo's customers, or oil purchased by PK from third parties and delivered to UMEC and Apollo's customers, for which PK was not paid.

      More specifically, starting in 2013 PK served as a contractor for UMEC, picking up, or "lifting" oil from UMEC's facility (the "Greenpoint Facility") on Newtown Creek in the Greenpoint neighborhood of Brooklyn, New York for delivery to UMEC's customers. Under the contracts between UMEC and PK, PK's drivers were provided with computerized cards ("Access Cards") that enabled the removal of fuel oil from a loading rack in the Greenpoint Facility, a process that also generated an electronic bill of lading for the lifted oil as well as resulted in the automatic issuance of a delivery ticket to UMEC's customers. The business relationship between PK and UMEC came to an abrupt end in mid-October 2014 when UMEC alleged withdrawals of oil by PK that were never delivered to UMEC's customers and thus for which UMEC was not paid. UMEC asserts that PK is liable on two theories: a contract theory, because PK agreed to be responsible to UMEC for all oil lifted using PK Access Cards, and a

---

[1] This Memorandum of Decision comprises the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable by Fed. R. Bankr. P. 7052.

tort theory, on the basis that PK converted the missing oil.  UMEC seeks compensatory and punitive damages for the over-lifting, along with prejudgment interest and attorneys' fees. UMEC also asserts that Gonzalez is liable for all of PK's liabilities to UMEC based on an unlimited guaranty executed in connection with the business relationship between UMEC and PK, as well as attorneys' fees and prejudgment interest.

PK asserts setoff claims for oil it delivered to UMEC's and Apollo's customers that it picked up from UMEC or purchased from another distributor after the controversy arose and for which it was not paid, as well as a defamation claim related to UMEC's conversion allegations.

The Court held a two-day trial on April 26-27, 2018 and considered the testimony of five live witnesses as well as reviewed the parties' additional witness deposition designations and four binders of trial exhibits.  The Court has also considered the parties' post-trial submissions, where based on the trial record, and a post-trial motion by PK and Gonzalez to reopen the trial to introduce additional evidence.

This Memorandum of Decision first states the Court's reasons for denying PK and Gonzalez' July 18, 2018 motion to reopen the trial to supplement the trial record with additional evidence, (a) because doing so would unduly prejudice UMEC and Apollo's conduct of the trial, (b) because of the ease with which PK and Gonzalez could have offered such evidence -- which was always within their control -- at trial, preceded by their failure to provide it by court-established discovery and pre-trial deadlines, and (c) because the additional documents are far from dispositive.

Then this Memorandum of Decision states the reasons for determining (1) that UMEC has satisfied its burden to establish (a) UMEC's aggregate contract claim against PK in the amount of $1,549,191.37, plus prejudgment interest thereon at 9 percent per year from October

14, 2014 to the bankruptcy petition date, subject to an offset by PK of $194,299.24 for $34,712.29 of unpaid delivery services and the oil that PK obtained from other sources and delivered to UMEC's customers without payment, plus prejudgment interest thereon at 9 percent per year from the delivery of such fuel to date, and (b) UMEC's guaranty claim against Gonzalez in the gross amount owed to UMEC by PK before prejudgment interest, plus prejudgment interest thereon at 9 percent per year to date, plus reasonable attorneys' fees and expenses in an amount to be determined consistent with this Memorandum of Decision, and (2) that PK's defamation claim should be dismissed.

## Jurisdiction

This dispute presents itself in the context of two lawsuits removed from New York state court[2] as adversary proceedings in this chapter 11 case and the Debtor's related objection to UMEC's Claim No. 6 filed in this case.  The Court has jurisdiction under 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference, dated January 31, 2012 (Preska, C.D.J.).  The lawsuits and claim objection are core proceedings under 28 U.S.C. § 157(b)(2)(B) to the extent they involve UMEC's claims against the Debtor's estate, and under 28 U.S.C. § 157(b)(2)(C) to the extent they involve PK's counterclaims against UMEC and 28 U.S.C. § 157(b)(2)(O) with respect to PK's claims against Apollo.  Because the parties consented at the final pretrial conference on May 16, 2017 to the Court's entry of a final order and judgment resolving the lawsuits, the Court is permitted under the U.S. Constitution to enter a final order and judgment resolving PK's counterclaims against Apollo and UMEC's claims against Gonzalez.  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1949 (2015).

## Procedural History

---

[2] UMEC commenced another lawsuit against Gonzalez in the United States District Court for the Eastern District of New York on December 19, 2014 [E.D.N.Y. Case No. 1:14-cv-07410-BMC], but it was dismissed without prejudice on April 13, 2015 for lack of subject matter (diversity) jurisdiction.

On February 12, 2015 PK commenced the first removed lawsuit (the "PK Action") against UMEC and Apollo in New York Supreme Court, Westchester County (the "New York Court").[3]  The PK Action originally contained nine counts, but the New York Court dismissed Counts One, Two, Three and Eight (which were unrelated to the present over-lifting dispute) on November 25, 2015.[4]

Count Nine alleges that UMEC is liable to PK for defamation in connection with statements allegedly made by UMEC employees to the effect that PK stole fuel oil from UMEC. PK asserts that these statements damaged it in an amount of no less than $1 million.  At the close of PK's case in chief, however, the Court granted UMEC and Apollo's motion for a directed verdict on the basis that PK had failed to introduce evidence that such statements were ever made.  Tr. 4/27/18 at 167:18–19.

Counts Four and Five in the PK Action relate to deliveries by PK of UMEC oil to UMEC or Apollo's customers for which PK was not paid.  Specifically, PK alleges that between May and November 2014, PK performed $34,712.29 worth of delivery services reflected in contemporaneous invoices that were never paid after the over-lifting dispute arose in October 2014.  Count Four alleges that this amount is due PK from Apollo on a theory of account stated, and Count Five alleges that UMEC and Apollo are jointly and severally liable for it on a *quantum meruit* basis.[5]

Counts Six and Seven allege that UMEC and Apollo are obligated to pay $159,586.95 for 74,004 gallons of fuel oil that PK bought from UMEC's competitor Sprague Resources LP ("Sprague") and delivered to UMEC or Apollo's customers after the over-lifting dispute arose.

---

[3] Joint Ex. 94.
[4] Joint Ex. 144.
[5] Joint Ex. 94 ¶¶ 48, 57

5

Count Six alleges that this amount is due on a theory of account stated, and Count Seven alleges that it is due on a theory of unjust enrichment or *quantum meruit*.[6]

UMEC commenced the second lawsuit (the "UMEC Action") in the New York Court on April 17, 2015.[7]  UMEC alleged that the use of PK Access Cards led to the wrongful taking of at least 673,000 gallons of UMEC oil for which it was not paid.[8]  UMEC later recalculated this amount to be 615,736.2 gallons, which it further reduced to 457,431.8 gallons, apparently in light of later cover or deliveries by PK in the last two weeks of October, 2014 after UMEC stopped doing business with it.  *See* UMEC's Post-Trial Memorandum, dated June 1, 2018 ("UMEC Post-Trial Brief"), at 16.[9]  UMEC seeks recovery of the value of this oil from PK on two theories:  first, on a contract theory that even if PK did not over-lift the oil, the over-lifting was achieved under circumstances that make PK liable under the terms of the underlying agreements between UMEC and PK; second, on a tort theory that PK converted it.  UMEC also seeks recovery from Gonzalez under his April 15, 2013 guaranty of PK's liability to UMEC (the "Guaranty")[10] to the extent established under either of the above theories.

### 1.  The Trial

Pursuant to the Court's usual practice, the parties submitted the direct testimony of witnesses under their control by affidavit or declaration under penalty of perjury and binders of trial exhibits that both sides agreed were admissible.  UMEC presented direct testimony by Anthony Valente, UMEC's Vice President and General Counsel (the "Valente Declaration"); Manug Aydin, the Scheduler and Terminal Controller of the Greenpoint Facility; and Jack

---

[6] *Id.* ¶¶ 60, 67, 71.
[7] Joint Ex. 97.
[8] *Id.* ¶ 26,
[9] *See also* Joint Exs. 131 and 132 reconciling gallons lifted by PK from UMEC and gallons delivered to UMEC customers through October 17, 2014 and October 31, 2014, respectively.
[10] Joint Ex. 16 .

Spaight, the Terminal Manager for the Greenpoint Facility.  PK presented direct testimony by Gonzalez (the "Gonzalez Declaration") and, live, by a former PK driver, Besar Haxhaj.  Each witness was subject to cross examination and re-direct examination, and, after the examinations were complete, the Court closed the evidentiary record with the agreed exception that the parties could submit additional deposition designations to support statements made during closing argument.  Tr. 4/27/18 at 169:16–21.

PK and Gonzalez did not dispute UMEC's calculations regarding the missing oil; rather, they attempted to show that PK was not responsible for its disappearance and that the documents underlying the calculations were unsound.  Similarly, UMEC did not dispute PK's asserted setoff claim.

The Court found all of the witnesses to be consistently credible with the exception of Gonzalez.  Gonzalez was at times evasive and vague in answering questions regarding the conduct of his business, including his and his wife's alleged monitoring of PK's drivers.  His testimony also revealed that over the years he has given a series of inconsistent explanations for the missing oil.

### 2.  PK and Gonzalez' Motion to Reopen the Trial

Purportedly in response to the Court's request for supplemental briefing on certain issues raised at trial, PK also submitted a second declaration by Gonzalez [ECF No. 22] (the "First Supplemental Gonzalez Declaration") and supporting documents (the "First Additional Documents"), which PK requested be admitted into evidence notwithstanding the close of the evidentiary record and the Court's direction that post-trial submissions should be based only on evidence admitted at the trial.  Tr. 4/27/18 at 227:14-16.  On June 5, 2018, UMEC filed *United Metro Energy Corporation's Response to Post-Trial Submission of Petroleum Kings and Asmel*

*Gonzalez* [ECF No. 23], requesting the Court to decline considering the newly offered evidence.

On July 18, 2018, PK and Gonzalez filed a notice of hearing [ECF No. 24] on a motion to reopen

the trial to offer new evidence and a *Declaration of Asmel Gonzalez in Support of Motion to Re-*

*Open Trial* [ECF No. 25] (the "Second Supplemental Gonzalez Declaration").   The Second

Supplemental Gonzalez Declaration included some of the First Additional Documents and

requested further new additions to the evidentiary record (the "Second Additional Documents"

and, together with the First Additional Documents, the "Additional Documents").   One day later,

PK filed *Petroleum Kings, LLC's and Asmel Gonzalez's Brief in Support of Motion to Reopen*

*Trial* [ECF No. 27] (the "Motion to Reopen") and an additional declaration by Gonzalez [ECF

No. 26] (the "Third Supplemental Gonzalez Declaration"), correcting statements in the Second

Supplemental Gonzalez Declaration.

Also on July 19, 2018, UMEC filed a letter [ECF No. 28] requesting the Court not to

consider the Motion to Reopen, on the basis that it was untimely.   On July 24, 2018, PK filed a

response arguing that (a) the Motion to Reopen was not untimely, and (b) even if the Motion to

Reopen were untimely, the Court should consider it in light of the alleged lack of prejudice to

UMEC.   On August 1, 2018, the Court held a hearing on the Motion to Reopen and took it under

advisement along with the issues raised by the trial.

### Discussion

### The Motion to Reopen

#### 1.  The Court Will Consider the Motion to Reopen.

UMEC argues that the Motion to Reopen should not even be considered in light of its

purported untimeliness under Local Bankruptcy Rule 9006-1(b), which requires all motion

papers to be served at least 14 days before the return date, and also because, UMEC contends,

the Motion to Reopen was filed in defiance of the Court's determination at trial that the evidentiary record was closed, including as to any post-trial submissions, with which counsel for PK and Gonzalez apparently agreed, Tr. 4/27/18 at 208:24-25, and the Court already denied such relief in responding negatively to PK's request in its June, 2018 supplemental briefing that it consider the First Additional Documents.

UMEC also argued that the Court should not consider the Motion to Reopen because (a) discovery closed in May 2016 while the PK Action and the UMEC Action were still pending in the New York Court and PK failed to produce the Additional Documents before that deadline, and (b) the Court previously directed the parties to identify their proposed exhibits and submit the agreed exhibit binders and trial declarations before the trial and PK failed to produce the Additional Documents by that deadline.

Although UMEC is correct that the Motion to Reopen was served only 13 days before the August 1, 2018 hearing, any prejudice from UMEC's having to argue the Motion to Reopen one day early was minimal and does not justify further delay in this proceeding.  I therefore treat the Debtor's July 24, 2018 letter as a request to consider the Motion to Reopen on one day's shortened notice, which I will grant under Fed. R. Bankr. P. 9006(c).  In addition, although the Court's June 4, 2018 email to PK and Gonzalez's counsel stated that the Court would consider only the evidence admitted at trial, PK had yet to make a proper motion to reopen the trial record.  Thus the Court had not already determined the issue raided by the Motion to Reopen. UMEC's other arguments for not considering the Motion to Reopen are appropriately considered in determining the Motion's merits.

**2.  The Motion to Reopen Should Be Denied.**

The Motion to Reopen seeks to reopen the trial record to admit the Second Supplemental Gonzalez Declaration, the Third Supplemental Gonzalez Declaration and the Additional Documents.  The Second Supplemental Gonzalez Declaration consists largely of an explanation of the Additional Documents and Gonzalez's excuse for not providing them earlier, and the Third Supplemental Gonzalez Declaration consists of line edits to the Second Supplemental Gonzalez Declaration.  Accordingly, the main focus is on the Additional Documents; if reopening the evidentiary record to admit them is not warranted, there would be no purpose in admitting the Second and Third Supplemental Gonzalez Declarations, and the First Supplemental Gonzalez Declaration would be reviewed only insofar as it addresses the evidentiary record before it was closed at the end of the trial.

As discussed in greater detail in the portion of this Memorandum addressing the merits, the evidence admitted at trial showed two fundamental things:  from October, 2013 to October 31, 2014, (1) 5,779,617 gallons of oil were lifted from UMEC using PK Access Cards,[11] and (2) UMEC was paid for only 5,322,185.2 gallons of oil delivered by PK to UMEC customers,[12] leaving 457,431.8 gallons for which it was not paid (before PK's claimed offset).  Based on the parties' agreements, as discussed below, the clear conclusion is that UMEC has established by a preponderance of the evidence that PK owes UMEC for the shortfall of at least 457,431.8 gallons of fuel oil before the PK's setoff claim.[13]

---

[11] *See* Joint Ex. 132, based on Joint Exs. 80, 101-113 (comprising UMEC's bills of lading) and 133.

[12] *Id.*   As noted in footnote 11, Joint Ex. 132 is based in part on Joint Ex. 80, which is PK's summary of its deliveries on behalf of UMEC, which UMEC -- to PK's advantage -- has accepted for purposes of the trial record). Tr. 4/27/18 at 181:19-182:16.  *See also* Joint Ex. 138, comprising all of UMEC's delivery tickets assigned to PK for the relevant October 2013-October 2014 period, and Joint Exs. 67, 126 and 127, consisting of UMEC's reconciliations of PK bills of lading and delivery tickets.

[13] The evidence at trial also established that, as of October 17, 2014, the shortfall was dramatically higher:  as of that date, PK had lifted 5,731,625.0 gallons of fuel and delivered 5,115,838.0 gallons to UMEC's customers.  *See* Joint Ex. 131 (a chart comparing PK's delivery numbers from Joint Ex. 80 with the delivery tickets in Joint Ex. 138 through October 17, 2014).  The natural inference is that, in order to reduce that shortfall between October 17, 2014

In addition, there was testimony during the trial that PK's trucks had meters that recorded the oil that they took on and discharged.[14]  At the close of the trial, the Court asked the parties to review the trial record, which contained the meter readings, to address what they showed.[15]  Both sides agreed in their post-trial submissions that the meter readings in evidence showed that PK's trucks discharged 5,962,934.1 gallons of fuel oil during the relevant period.[16]  Using PK's delivery information,[17] UMEC correctly pointed out that this was 640,749 more gallons than for which UMEC was paid.[18]  That amount is remarkably close to the 649,137 gallons stated in UMEC's October 28, 2018 demand letter/invoice to PK[19] and also reasonably close to the 615,786.2 missing gallons alleged by UMEC as of October 17, 2018, before PK's apparent cover during the last two weeks of October, 2014,[20] which tends to provide additional support for the evidence already supporting the conclusion that PK is responsible for the oil for which UMEC has not been paid.

The Additional Documents consist of the following: (a) a summary of the meter readings from PK's trucks that, as far as oil discharged from PK's trucks and oil delivered to UMEC's customers, agrees with UMEC's calculations discussed above, that 5,962,934.1 gallons of fuel oil were removed from PK's trucks that picked up oil from UMEC and only 5,322,185.2 gallons of oil were delivered from those trucks to UMEC customers as per PK's agreed calculations, leaving a 640,749 shortfall, in each case based on the evidence admitted at trial,[21] (b) 117 pages

---

and October 31, 2014, PK obtained fuel from other sources than UMEC and used it to satisfy UMEC delivery tickets, or belatedly delivered UMEC fuel.
[14] Tr. 4/27/18 at 23:9–33:14.
[15] Tr. 4/27/18 at 240:7–12.
[16] Ex. D to Suppl. Gonzalez Decl. at 1; UMEC Post-Trial Brief at 15.  UMEC contended, however, that there was no testimony as to whether the meters could be turned off, bypassed or altered.  UMEC Post-Trial Brief at 14–15.
[17] Joint Ex. 80.
[18] UMEC Post-Trial Brief at 15-16.
[19] Joint Ex. 77.
[20] Joint Ex. 131.
[21] *See* Motion to Reopen Ex. D, at 1.

of Sprague bills of lading reflecting pickups of fuel oil by PK from Sprague,[22] which the Third

Gonzalez Declaration asserts was delivered to PK's customers, Motion to Reopen ¶ 2, (c) 6

pages of documents[23] that PK asserts relate "to fuel PK picked up from Sprague and delivered to

Approved Oil Company of Brooklyn ("Approved")," Motion to Reopen ¶ 3, (d) summaries,[24]

apparently prepared by Gonzalez, of meter readings from PK's trucks that show fuel oil placed

into and discharged from the trucks without distinguishing where the oil came from or where it

went, and (e) the summary chart prepared by Gonzalez previously referred to which shows the

aggregate oil discharged from PK's trucks and delivered to UMEC's customers and *also* purports

to show oil delivered by PK's trucks to PK's customers after having been picked up from

Sprague (243,477 gallons) and oil delivered by PK to Approved's customers after having been

picked up from Sprague (279,489 gallons).[25]

PK asserts that "the Additional Documents demonstrate that virtually all of the fuel oil

loaded on the Trucks, was also delivered to customers of UMEC, customers of Approved and

customers of PK," Suppl. Gonzalez Decl. ¶ 3, asking the Court to draw the inference that there

was no additional UMEC fuel oil discharged from PK's trucks for which UMEC has not been

paid.  Instead, PK contends for the first time that the oil discharged from PK's trucks that UMEC

asserts was missing UMEC oil was really oil lifted from Sprague.

---

[22]  *See* Ex. A to Motion to Reopen.

[23]  Ex. B to Motion to Reopen.

[24]  Ex. D to Motion to Reopen.

[25]  Ex. D, p. 1 to Motion to Reopen.  This chart also purports to summarize the Additional Documents to the effect that 267,435 gallons of oil were picked up by PK's trucks from Sprague for delivery to PK's customers and 311,205 gallons were picked up by PK's trucks from Sprague for delivery to Approved's customers.  These numbers obviously do not correspond to the oil that the chart states was actually delivered to PK and Approved's customers, suggesting that PK and Approved were shortchanged by 23,958 and 31,716 gallons, respectively, or 55,674 gallons in the aggregate.  The chart also suggests that PK's trucks delivered 62,181 gallons more to UMEC's customers than PK picked up from UMEC.  It appears that this amount would fill about than ten of UMEC's trucks, on average.  Tr. 4/26/18: 9-15.

12

PK admits that it did not produce "most of the Additional Documents" to UMEC at any point during this case. Second Suppl. Gonzalez Decl. ¶ 8. In fact, PK has not identified any Additional Document as having been produced during discovery. Gonzalez's Third Supplemental Declaration stated that the reason for this lack of production is that that he "did not realize the significance of the 'Meter Readings' stamped on the UMEC delivery tickets . . . until the 'end' or 'close' of trial." Third Suppl. Gonzalez Decl. ¶ 3. Likewise, the Motion to Reopen asserts that "Gonzalez only realized [the relevance of the Additional Documents] when he began his analysis of the Meter Readings after Trial in order to provide the analysis sought by the Court."

"While it is not entirely clear which Federal Rule of Civil Procedure authorizes [trial] courts to reopen an evidentiary record prior to judgment, it is clear that [trial] courts have the discretion to grant such a motion: such an application to reopen the record is committed to the sound discretion of the [trial] court." *Romeo v. Sherry*, 308 F. Supp. 2d 128, 138–39 (E.D.N.Y. 2004) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331–32 (1971)).[26] The Second Circuit has not adopted a clear standard for such a motion, but has cited with approval to the Fifth Circuit's statement that a trial court should decide it in light of "the importance and probative value of the evidence, the reason for the moving party's failure to introduce the evidence earlier, and the possibility of prejudice to the non-moving party." *Garcia v. Woman's Hospital of Texas*, 97 F.3d 810, 814 (5th Cir. 1996) *cited by Matthew Bender & Co., Inc. v. West Pub. Co.*, 158 F.3d at 679 (2d Cir. 1998). Some courts, although none in this Circuit, have explicitly held that "[a] motion to reopen the evidence [before judgment] is

---

[26] In *Zenith*, the Supreme Court stated without a citation to the Federal Rules that "[t]he trial judge . . . might have permitted reopening. Like a motion under Rule 15(a) to amend the pleadings, a motion to reopen to submit additional proof is addressed to his sound discretion." *Zenith*, 401 U.S. at 331. *See also Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d 674, 679 (2d Cir. 1998) ("A district court's decision to reopen the proof to allow a party to submit additional evidence is subject to its sound discretion.").

distinguishable from a Rule 59 motion [to reopen a judgment] because . . . the court need not find that the evidence is newly discovered or would demonstrate a manifest error of law or fact." *Rivera v. Kanewske (In re Kanewske)*, A.P. No. 9:16-ap-00094-FMD, 2017 Bankr. LEXIS 3296, at *13 (Bankr. M.D. Fla. Sept. 29, 2017) (internal citations and quotation marks omitted).  It has also been held that a trial court "may properly look with more favor upon a motion to reopen made after submission, but before any indication by [the court] as to its decision."  *Caracci v. Brother Int'l Sewing Machine Corp.*, 222 F. Supp. 769, 771 (E.D. La. 1963), *aff'd* 341 F.2d 377 (5th Cir. 1965).  However, "[a]n application to reopen the record ordinarily will be denied unless the party seeking to expand the record failed to adduce the evidence sought to be added notwithstanding its own due diligence."  *Ortho Diagnostic Systems, Inc. v. Abbot Laboratories, Inc.*, 926 F. Supp. 371, 372 (S.D.N.Y. 1996) (denying motion to reopen summary judgment record).

In this Circuit, courts have generally[27] adopted the formulation of *John v. Sotheby's, Inc.*, 858 F. Supp. 1283, 1288 (S.D.N.Y. 1994), *summarily aff'd* 52 F.3d 312 (2d Cir. 1995).  In that case, noting the absence of definitive authority, the court adopted a three prong test:  "the court must consider (1) whether or not the moving party's failure to submit evidence was the result of its own lack of diligence; (2) the extent to which reopening the record might prejudice the non-movant; and (3) where the interests of justice lie."  *Id.* at 1288.  The movant has the burden of proof on all three prongs.  *Id.*  Apparently the "interests of justice" factor takes into account the importance and probative value of the newly offered evidence noted in *Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d at 678, a case in which the Circuit stated that the party

---

[27] *See, e.g., Curiale v. Capolino*, 883 F. Supp. 941, 946 n.2 (S.D.N.Y. 1995); *Ortho Diagnostic Systems, Inc. v. Abbot Laboratories, Inc.*, 926 F. Supp. 371, 372 (S.D.N.Y. 1996); *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 723 (S.D.N.Y. 1997); *Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 238 F. Supp. 2d 604, 607 (S.D.N.Y. 2002); *In re Sanders*, 408 B.R. 25, 40 (Bankr. E.D.N.Y. 2009).

opposing the request "point[ed] to no specific prejudice from the delay" and, further, that the new evidence was offered only to show the existence of a live controversy and dismissal for mootness would have resulted only in the filing of a new complaint relying on the additional information. *Id.*

PK and Gonzalez have not met their burden with respect to their diligence. The Third Supplemental Gonzalez Declaration's assertion that Gonzalez "did not realize the significance of the 'Meter Readings' stamped on the UMEC delivery tickets (already in evidence at Trial) until the 'end' or 'close' of trial," Third Suppl. Gonzalez Decl. ¶ 3, is not credible. Counsel for PK and Gonzalez first raised the issue of the meter readings at trial in an attempt to demonstrate that Gonzalez would have been able to conduct effective daily reconciliations between UMEC's bills of lading and delivery tickets by ensuring that all delivery tickets were stamped with sequential meter numbers. *See* Tr. 4/27/18 at 20:25 ([Mr. Bond]: "Okay. Can you explain the meter stamp system in your trucks, please?"). This was not an off-the-cuff reference but a scripted part of PK and Gonzalez's presentation: earlier in the day, counsel had interrupted Gonzalez's testimony to reassure him that he would "get to the meters." Tr. 4/27/18 at 17:17–18. Moreover, since its inception in 2014 this case clearly involved a comparison of the flow of oil into and out of PK's trucks and where it came from.[28] It defies belief that PK and Gonzalez understood this point only after the trial when they offered up the Additional Documents to argue, for the first time, that the trucks' meter readings plus the Additional Documents showed that the "missing" UMEC oil was really Sprague oil. *See Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 723 (S.D.N.Y.

---

[28] *See, e.g.*, Joint Ex. 85, consisting of a November 11, 2014 letter from UMEC to PK's counsel stating that before PK can resume its services UMEC must complete its investigation of the over-lifting. As part of that investigation, UMEC requested that by November 26, 2018 PK provide, among other things, "all digital metering date collected from every vehicle operated by or on behalf of [PK] or any affiliate for the period October 2013 through October 2014." *Id.*

1997) (motion to reopen denied where newly offered evidence pertains to issue arising before the close of trial).

PK also argues that UMEC will not be prejudiced by the Motion to Reopen because "[n]o decision ha[d] yet been rendered here and UMEC, thus, has not taken, and could not have taken, any steps in connection with any such decision." Motion to Reopen at 8. This argument begs the question, however: the prejudice to the other side from a motion to reopen a trial will never be that party's reliance on the court's decision, which has not yet been issued;[29] rather, the relevant prejudice is that resulting from reopening the trial before the issuance of the decision.

PK also argues that responding to the Additional Documents will not prejudice UMEC because "the actual time spent in Court will be dedicated to UMEC's cross-examination/*voir dire* of Mr. Gonzalez." *Id.* That is, PK posits the immediate re-closing of the evidentiary record after the Additional Documents are admitted without giving UMEC the chance to respond other than by cross-examining Gonzalez without the benefit of another deposition or the right to take additional discovery or otherwise to develop the record. That is, PK assumes there will be no prejudice because UMEC would be precluded, to PK's benefit, from having to do much additional work. The unfairness to UMEC is obvious. Once one properly assumes that UMEC would be entitled to fully respond to the proposed new evidence, it is clear that in addition to preparing for an effective cross examination of Gonzalez, UMEC would be expected to make inquiries of Sprague, Approved and perhaps other customers of PK, as well as to inquire into the reliability of the trucks' meter readings, a fact only cursorily addressed at trial given the relative unimportance of the trial testimony on meter readings and accepted by UMEC thereafter, because without the newly offered Sprague bills of lading the meter readings support UMEC's case.

---

[29] If a decision had been issued, one would be considering a motion under Fed. R. Bankr. P. 9023, incorporating Fed. R. Civ. P. 59.

That prejudice is compounded by the fact that PK did not produce the Additional Documents in discovery, although it contends that they now are the key to its case, or before trial, notwithstanding deadlines set by the courts supervising the litigation.  UMEC relied on this state of affairs in developing a trial strategy that was not based on dealing with the Additional Documents.  The interests of justice do not favor a party withholding documents in discovery for two years on the basis that they are irrelevant and then seeking to introduce them for a new argument post-trial.

The only consideration that might offset the foregoing factors would be the probative value of the Additional Documents and Gonzalez's testimony related to them.  Based on a review of the Additional Documents and the Gonzalez Declarations, however, it appears that they are not the conclusive "missing link" that the Motion to Reopen posits.  First, the Additional Documents contain little to no support for PK and Gonzalez's contention that the oil loaded into PK's trucks was delivered to PK and Approved's customers: PK and Gonzalez's chart's reference to deliveries of 243,477 gallons to PK's customers has no documentary support, and its reference to deliveries of 279,489 gallons to Approved's customers has minimal documentary support, comprising bills of lading for under 10,000 gallons.[30]  In addition, the alleged pickups from Sprague are still 117,783 gallons short of explaining the difference between the oil that the meters show was released from the trucks and the oil delivered to UMEC's customers, before reflecting the credits that UMEC has given PK (191,705.2 gallons)[31] to reduce the gallons at issue to 457,431.8 or the PK setoff of 74,004 more gallons picked up from Sprague.  Gonzalez's explanation for this, without any documentary support, is that the same oil may be released more than once from PK's trucks because of truck testing and the shifting of oil from truck to truck.

---

[30] Ex. B to Motion to Reopen.
[31] Joint Ex. 80; UMEC Post-Trial Brief at 12-13.

Third Gonzalez Declaration ¶ 5.  Of course, UMEC also would be entitled to inquire into the reliability of the Additional Documents, including into the reliability of the trucks' meters and the linkage of the Sprague invoices to the PK trucks on which UMEC's fuel was (as clearly shown by the other evidence, discussed below) loaded.  At best for PK, therefore, after causing considerable prejudice to UMEC, PK's proposed additional evidence would potentially counter the corroborative evidence of the trucks' meter readings without countering the clear primary evidence of the use of PK's drivers' Access Cards to load 457,431.8 more gallons of oil onto PK's trucks than for which UMEC was paid.  At least two courts have held that, where new evidence offered through a motion to reopen the trial would not change the court's decision, that alone is reason to deny the motion.  *See In re Sanders*, 408 B.R. 25, 41 (Bankr. E.D.N.Y. 2009); *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. at 723.

The prejudice to UMEC and the interests of justice thus also argue against reopening the trial to consider admitting the proposed additional evidence and the further discovery and trial time that would ensue from such decision.  Based on PK and Gonzalez's failure to carry their burden on any of the relevant factors, therefore, the Motion to Reopen is denied.

### The Merits

A claim shall be disallowed to the extent it is "unenforceable against the debtor and property of the debtor under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  The enforceability of a claim under agreements or applicable law is subject to a shifting burden of proof.  *In re Residential Capital, LLC*, 518 B.R. 720, 731 (Bankr. S.D.N.Y. 2014).  A proof of claim that complies with Fed. R. Bankr. P. 3001 constitutes "prima facie evidence of the validity of a claim."  *Id.*  To overcome this evidence, an objecting party "must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim."  *Sherman*

18

*v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000).  Only if an objector has

produced "evidence equal in force to the prima facie case" can it "shift[] the burden back to the

claimant to prove by a preponderance of the evidence that under applicable law the claim should

be allowed." *Residential Capital*, 518 B.R. at 731, quoting *Creamer v. Motors Liquidation Co.

GUC Trust (In re Motors Liquidation Co.)*, 2013 U.S. Dist. LEXIS 143957, at *12–13 (S.D.N.Y.

Sept. 26, 2013) (internal quotation marks omitted).

Proof of Claim No. 6 was filed by UMEC in compliance with the Federal Rules of

Bankruptcy Procedure, in that it included the documents upon which it is based and was

otherwise procedurally proper, and thus is prima facie evidence of the validity of the claim.

### 1. UMEC Successfully Established PK's Liability to UMEC for Breach of the Parties' Carriage Agreement and Terminal Access Agreement

Under New York law -- which governs here based on the parties' agreements and the

location of all relevant conduct -- the elements of a cause of action for breach of contract are (i)

the existence of a contract, (ii) the plaintiff's performance under the contract, (iii) the defendant's

breach of that contract and (iv) resulting damages.  *Fischer & Mandell LLP v. Citibank, N.A.*,

632 F.3d 793, 799 (2d Cir. 2011).  The relevant contracts here are PK and UMEC's Carriage

Agreement, made as of September 22, 2011 (the "Carriage Agreement"),[32] and their Terminal

Access Agreement, executed April 13, 2013,[33] as well as the Guaranty.[34]

Under The Carriage Agreement, PK, as the "Carrier," agreed that "Carrier is totally

responsible for inventory reconciliation each day and any discrepancies or cause due to lack of

performance according to the bid agreement with [UMEC]," Carriage Agreement ¶ 3.7; that

---

[32] Joint Ex. 2. At one point during closing argument, UMEC's counsel eschewed reliance on this agreement, Tr. 4/27/18 at 171: 3-5,  but it is still relevant.
[33] Joint Ex. 15.  As discussed below, the Terminal Access Agreement has addendums identifying PK drivers and PK's acknowledgement of its liability for use of the Access Cards assigned to its drivers.  Joint Exs. 22 and 65 are additional Terminal Access Agreement addendums for PK drivers.
[34] Joint Ex. 16.

Carrier shall preform assigned deliveries and "shall prepare and/or obtain a receipt on a form acceptable to [UMEC]" for each delivery, with any unsigned tickets to be the responsibility of the Carrier, *Id.* ¶ 4.3; and that Carrier shall comply with all record keeping requirements of [UMEC], "including, but not limited to the provision by Carrier to [UMEC] of bills of lading and delivery tickets . . . with respect to all product loads and deliveries, *Id.* ¶ 4.4. The Carriage Agreement further provides that Carrier "shall perform the loading, transportation and delivery services . . . so as to . . . deliver Product in specific time frames as mutually agreed by [UMEC] and Carrier, *Id.* ¶ 5.6; that on or about the tenth day of each month, UMEC will provide Carrier with a written statement of delivery activity for the prior month, Carrier shall reconcile the statement with its records and notify UMEC in writing of any discrepancies or adjustments no later than the fifteenth day of the month, and the statement shall be deemed accurate for all subsequent purposes if no such notification is timely received by UMEC, *Id.* ¶ 5.12; and that "[UMEC] shall maintain a perpetual inventory balance for purposes of this Agreement with the Carrier responsible for any discrepancies." *Id.* ¶ 5.13.

Under the Terminal Access Agreement as a condition to obtaining access to the Greenpoint Facility, PK agreed on behalf of itself and its drivers by means of Access Cards that

> Customer/Carrier understands that each Assigned Customer Number is encoded to cause the Terminal's automated equipment to charge the Customer/Carrier's account number(s) for all Products withdrawn from the Terminal by means of such Customer Number. All Products so charged to Customer/Carrier's account number(s) will be paid for, exchanged, through-putted, or delivered on behalf of UMEC according to the terms and conditions of any separate purchase, exchange, throughput, or delivery agreement(s) between Customer/Carrier and UMEC.[35]

And

> Customer/Carrier shall pay UMEC the value of any Products lost, stolen or unaccounted for at the Terminal or charged or obtained by means of the misappropriation or unauthorized use or duplication of any Access Card issued to

---

[35] Joint Ex. 15: Terminal Agreement ¶ 9.b.

Customer/Carrier under this Agreement.  In the absence of a separate written agreement with UMEC specifying the price of Products charged to the Customer/Carrier's account number(s) at the Terminal, the value of such lost, stolen or misappropriated Products will be the price of such Products in effect at the Terminal on the date of the loss, theft or misappropriation.[36]

*See also* Addendum C to Terminal Access Agreement:

Customer Acknowledgement of Access Card Receipt.  The customer agrees to assume financial responsibility for all products withdrawn using the cards assigned to him, until such time as the card is returned to UMEC or the care [sic] is reported lost or stolen.  It is the responsibility for the customer to request that a card be invalidated if the driver is transferred or terminates employment under no conditions will the card be duplicated.

Thus, with respect to UMEC's breach of contract action the burden is on PK to come forth with sufficient evidence that if believed would show either that (i) UMEC did not perform its obligations under the Carriage Agreement and the Terminal Access Agreement, (ii) PK did not breach any of the foregoing provisions of those agreements, or (iii) UMEC was not damaged by the breach of any such provisions, if one occurred, when UMEC was not paid for the 457,431.8 gallons of fuel oil lifted from the Greenpoint Facility.

### A. PK Did Not Produce Evidence to Shift the Burden on UMEC's Performance Based on UMEC's Alleged Delay.

At trial, PK attempted to elicit testimony from Anthony Valente (UMEC's vice president and general counsel) on re-cross to show that UMEC had violated the duty of good faith and fair dealing by not notifying PK of the missing oil before mid-October 2014.  Tr. 4/26/18 at 160:8–10.  However, New York law is clear that while the covenant of good faith and fair dealing inherent in most contracts "encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included and . . . prohibits either party from acting in a manner which will have the effect of destroying or injuring the right of the other

---

[36] *Id.*, ¶ 9.d.

party to receive the fruits of the contract, . . . [it] cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract." *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 305–06 (S.D.N.Y. 1998) (internal quotation marks and citations omitted).  Particularly in light of the fact that ¶¶ 3.7, 4.3, 4.4, 5.12 and 5.13 of the Carriage Agreement contain procedures for reporting and recordkeeping that place the burden of non-performance, non-objection and loss on the Carrier, PK, without a duty on UMEC's part to notify PK of a claim, and the Terminal Access Agreement contains explicit notification requirements for certain other events and acts taken by the parties,[37] the Court declines to read into it an unstated obligation that UMEC provide notice to PK on a specific timeline of PK's own alleged breach.

More generally, PK has pointed to no principle of contract law or provision of the parties' agreements that would lay on UMEC a duty to discover and correct PK's own breach.  *Cf. Kane v. BOC Grp., Inc.*, 234 F.3d 160, 165 (3d Cir. 2000) ("[I]f [plaintiff]'s negligence consists merely of failing to discover and correct [defendant]'s own breach of contract . . . , [plaintiff]'s negligence does not excuse [defendant]'s breach and [plaintiff] may recover.").

Moreover, Paragraph 15 of the Terminal Access Agreement provides that "UMEC's failure to enforce a right or remedy under this Agreement will not impair such right or remedy or be construed as a waiver of such right or remedy."  Such no-waiver clauses are enforced under New York law.  *See, e.g.*, *Rosenzweig v. Givens*, 62 A.D.3d 1, 7 (N.Y. App. Div. 1st Dep't 2009) (failure to demand payment for breach for over three years did not result in waiver); *In re Rock 49th Restaurant Corp.*, No. 09-14557, 2009 Bankr. LEXIS 3882, at *6 (Bankr. S.D.N.Y. Dec. 10, 2009) ("many years").

---

[37] *See, e.g.*, Terminal Access Agreement ¶ 8 (requiring written notice from PK to UMEC of any material change in or cancellation of insurance).

PK's attempt to shift the burden on the element of UMEC's performance fails for a second reason, as well:  the testimony elicited at trial could at most be taken to show that, *had* UMEC conducted an earlier investigation, UMEC *could have* discovered PK's alleged over-lifting before it did.  Even if UMEC had an implied duty under the Terminal Access Agreement to notify PK promptly of UMEC's awareness of PK's over-lifting, the record at trial does not establish that UMEC actually breached such a duty.  Indeed, the evidence showed that UMEC notified PK promptly after learning of the over-lifting.

In closing argument, PK and Gonzalez's counsel suggested, to the contrary, that Scott Alnwick, an employee in the operations department at UMEC, testified in designated deposition testimony that he "conducted reconciliations every day of Petroleum Kings and everyone else." Tr. 4/27/18 at 202:10–14; *see also* Tr. 4/27/18 at 203:8–11 ("Mr. Alnwick said his operations department, every day, did a reconciliation.").  This statement by counsel was allegedly a summary of Alnwick's deposition testimony, which counsel for UMEC agreed could be admitted subject to counter-designations by UMEC.  *See* Tr. 4/27/18 at 166:17–19 ([Mr. Wagner]:  "Your Honor, he can use whatever transcripts he wants today.  I don't -- I don't have a problem with it.").  PK and Gonzalez's counsel mischaracterized this testimony, however, which went as follows:

> [A]: "[O]nce we get all the data back from the carrier, we would get all the loading tickets [i.e., bills of lading] live from Toptech which we pull everyday.  We would enter those, we would see what he loaded.  Once we get the ticket back from the carrier, we would see the discrepancy of gallons."
> [Q]: "But that system was *not* in place back in 2013 through mid 2014?" (Emphasis added.)
> [A]: "Not to my knowledge."

Alnwick Dep. Tr. 5/5/16, at 41:4–13.    Therefore, far from establishing that UMEC was performing regular reconciliations at the relevant time and holding back from revealing the discrepancy to PK in order to increase the claim,[38] Alnwick's testimony suggests that UMEC implemented a reconciliation policy as a safeguard after the facts at issue and in all likelihood in response to having discovered that UMEC had not been paid for hundreds of thousands of gallons of fuel oil.

### B. PK Successfully Shifted the Burden to UMEC on PK's Breach of the Terminal Access Agreement, but UMEC Proved PK's Breach at Trial by a Preponderance of the Evidence.

UMEC asserted in its proof of claim and in its complaint in the UMEC Action that PK Access Cards were used to lift fuel oil in excess of that reflected in UMEC's records of PK's deliveries to UMEC customers, and that PK is liable under the Carriage Agreement and the Terminal Access Agreement for UMEC not being paid therefor.    In ¶¶ 9.b. and d., as well as Addendum C of the Terminal Access Agreement, PK indeed agreed to pay UMEC the value of any fuel lifted from the Greenpoint Facility using PK Access Cards.    Pursuant to ¶ 7.2 of the Terminal Access Agreement, moreover, PK agreed that it would not have a defense to its obligations under the Terminal Access Agreement merely because "the responsible party was a third-party not in privity to this Agreement or that [PK] did not exercise dominion or control over the acts or omissions of third-parties acting or purporting to act on behalf of [PK]."[39]    While Gonzalez testified in his original Declaration that he believes "someone else picked up oil from [UMEC] under [PK's] name," Gonzalez Decl. ¶ 22, if this was done using PK's Access Cards PK therefore nevertheless would be liable under the terms of the Terminal Access Agreement to UMEC for that oil.    Thus even if one were to credit it in its entirety, therefore, Gonzalez's

---

[38] The logic underlying such an accusation is of course puzzling as well:  why would a supplier intend to *increase* its exposure to a carrier rather than promptly end it?

[39] *See also* Carriage Agreement ¶ 5.6.

Declaration would not negate PK's breach if the missing oil was in fact obtained by using PK Access Cards.

At trial, Gonzalez further testified, however, that PK had various internal reporting practices that would have shown over-lifted oil and that, despite reviewing the output of those features on a daily basis, he saw no evidence of over-lifting.  Tr. 4/27/18 at 23:9–48:5.  This is sufficient evidence that, if credited, shift the burden of proving PK's breach to UMEC.  UMEC has met its burden, though, by a thorough description of the processes in place at the Greenpoint Facility for lifting oil and the evidence showing a discrepancy between the amount of oil lifted by PK and the amount delivered by PK to UMEC's customers, as well as UMEC's calling into question the credibility of Gonzalez's testimony about internal monitoring measures.

The trial testimony established that the claimed missing oil was in fact lifted using PK's Access Cards.  The Valente Declaration provides an overview of how PK obtained fuel oil from UMEC.  Valente testified that for the relevant period under United States Department of Homeland Security ("DHS") regulations, UMEC was required to use a Transportation Worker's Identification Card ("TWIC") system to monitor and control access to the Greenpoint Facility, and that an individual was required to undergo a background check to obtain a TWIC.  Valente Decl. ¶ 24.

Valente further testified that UMEC, in part using the information connected to a given individual's TWIC, used a separate system (the "Toptech system") to govern contractor employees' access to the Greenpoint Facility and their ability to obtain oil there.  Valente Decl. ¶¶ 30–32.  Valente testified that UMEC issued computerized Access Cards to individual employees of each contractor, Valente Decl. ¶ 33–34, and that an Access Card was required for a contractor's employee to obtain access to the Facility, which was surrounded by a gated fence

and monitored by approximately 16 video cameras to guard against unauthorized entry. *Id.* ¶¶ 24, 25, 28, 30.

Valente further testified that both UMEC employees and contractor employees loaded trucks with fuel oil at the Greenpoint Facility from a loading rack. *Id.* ¶ 25. UMEC's dispatchers assigned deliveries to contractors (not to individual contractor employees) by sending contractors delivery tickets, which instructed the contractor to lift a certain amount of oil and deliver it to a UMEC customer. *Id.* ¶ 38. Importantly, in order to obtain oil from the loading rack, a driver was required to present his or her Access Card to the automated Toptech system and enter (a) a personal identification number ("PIN") unique to the driver who holds that card, and (b) a truck number, for the records of the contractor. *Id.* ¶¶ 35, 40.

Valente further testified that each time a driver loaded oil at the loading rack, the Toptech system created two identical copies of a bill of lading, which identified, among other things, (a) the carrier or contractor for whom the driver was lifting oil, (b) the driver who was lifting oil, (c) start and stop times for the load, and (d) the amount of oil loaded. Valente Decl. ¶ 41. Valente testified that when a driver lifted oil, he or she would be required to sign one copy of the bill of lading immediately and hand that copy in to UMEC personnel at the Greenpoint Terminal and retain the other copy for PK's records. *Id.* ¶ 42.

This testimony, which the Court found credible, makes it more likely than not that the amount of fuel alleged by UMEC to have been lifted using PK's Access Cards was in fact lifted using those cards, and unlikely that a method other than the most obvious Access Card method was used to lift the missing fuel.

Attempting to counter it, PK and Gonzalez noted that the Terminal Access Agreement implicitly acknowledges that Access Cards can be duplicated, as well as the inability of UMEC's

witnesses to testify with one hundred percent certainty that no duplication was possible. *E.g.*, Tr. 4/26/18 at 82:23–83:6 ([Mr. Bond]: "[T]hey've taken the position cards cannot be duplicated. If they can't be duplicated no one will put in duplication. I mean, agreements are tailored to the specific circumstances. You don't just throw in the kitchen sink."). However, the inclusion in the Terminal Access Agreement of a provision shifting the risk of loss from UMEC in the event that someone could figure out how to duplicate PK's Access Cards is not evidence that such duplication was possible as a matter of fact, much less that UMEC actually engaged in such duplication to frame PK for over-lifting (the only instance when PK could be relieved of the burden of loss using PK Access Cards notwithstanding ¶¶ 9.b. and d. and Addendum C of the Terminal Access Agreement).

To support such a contention, PK noted that under cross examination, Aydin (UMEC's terminal controller) and Spaight (UMEC's terminal manager) testified that the PIN associated with each driver's Access Card is only the last four digits of the driver's driver's license number, Tr. 4/26/18 at 187:11–13 (Aydin), 193:8–10 (Spaight), and PK's counsel elicited testimony from Valente suggesting that UMEC might have access to each driver's license number in connection with the drivers' applications for Access Cards. Tr. 4/26/18 at 53:12–14 ([Q]: "And presumably then UMEC keeps a record of each driver's license number?" [A]: "I believe so."). Further, Spaight testified that the Toptech system does not check the accuracy of the truck number entered, Tr. 4/26/18 at 196:23–25. At best, however, this testimony, which was the only other evidence offered to counter UMEC's contentions regarding the reliability of the Access Card process, suggested the hypothetical possibility that UMEC altered or duplicated PK Access Cards to feign the over-lifting and that the oil at issue was never really loaded onto PK's trucks. There was no evidence to suggest that anyone from UMEC actually engaged in such a scheme,

27

though, and the contention is far less believable than UMEC's argument that PK's Access Cards

worked as intended and, as agreed, PK bears the responsibility for oil lifted using the cards for

which UMEC was not paid.

**i.    _The Bills of Lading in Exhibits 101–113 Accurately Reflect the Fuel Lifted by PK._**

As for the total amount of oil lifted by PK, UMEC introduced what it asserts are all the

bills of lading issued under PK Access Cards between October 2013 and October 2014.[40]  PK

attempted to dispute UMEC's characterization of these exhibits as an accurate picture of the oil

lifted by PK on three grounds:  (1) that these bills of lading included additional bills of lading

beyond those contemporaneously created by PK and PK's drivers' use of Access Cards, (2) that

the bills of lading could not serve as evidence of the amount of oil lifted because they were not

signed by PK's drivers, and (3) that UMEC could not establish that UMEC employees had not

duplicated PKs Access Cards for their own use.

In support of its first argument, PK again refers to the designated Alnwick deposition

testimony.  In closing, PK's counsel stated that "Mr. Alnwick, the transportation manager,

testified that the bills of lading that were used to determine the overloading were not the ones

that were in -- were not in the system.  They [UMEC's witnesses] testified that they came from

the system.  They were not. . . . [The bills of lading in Exhibits 101–113] didn't come out of the

Toptech digital system that they used that they're relying on.  Just that spits out the bills of

lading.  They weren't there."  Tr. 4/27/18 at 201:9–21.  This is another mischaracterization of the

deposition testimony, however.  While Alnwick did testify that the bills of lading "weren't in

[his] system," Alnwick Dep. Tr. 5/5/16 at 65:4, he clarified shortly thereafter that the "system" to

which he was referring was his own separate recording of bills of lading received _back_ from

---

[40] Joint Exs. 101-113

contractors at the end of each day.   Alnwick Dep. Tr. 5/5/15 at 65:22–66:2.   Alnwick's

deposition testimony thus reflects his assertion that some of the bills of lading in Joint Exs. 101–

113 were never provided to him by PK after deliveries, not that those bills of lading were not the

authentic output of the Toptech system in UMEC's records generated when the oil was lifted.   In

fact, the evidence established that the bills of lading were automatically and regularly generated

by the Toptech system.

PK also attempted at trial to dispute the validity of the bills of lading included in Joint

Exs. 101–113 on the ground that the original bills of lading (those produced by the Toptech

system at the time oil was withdrawn) were not signed by the drivers who lifted the oil.

Gonzalez Decl. ¶ 17; Tr. 4/26/18 at 249:16–255:6.   UMEC never asserted, however, that those

exhibits are copies that were printed from the Toptech system when oil was lifted for the driver's

signature; instead, UMEC represents that they accurately reflect the bills of lading contained in

the Toptech system.   *See* Aydin Decl. ¶ 9 ("As a driver removes the card from the reader at the

loading rack, the Toptech system automatically generates a bill of lading, two copies of which

are printed.").   Accordingly, PK has not undermined the effectiveness of Joint Exs. 101–113 by

pointing out that they are not something they never purported to be.

Finally, as noted above, PK attempted at the trial to show that it was possible that UMEC

employees had obtained duplicates of PK's Access Cards and used them to lift additional fuel in

PK's name.   *See, e.g.*, Tr. 4/27/18 at 195:2–7 ([Mr. Bond]:   "They have the cards.   They could

have duplicated them all before giving them to Petroleum Kings.   They have everything in all the

data in their system.   They could have made another one.   They picked the PIN[s].   They know

the PIN[s].   They have the driver's licenses.   The PIN[s] are the last four digits of the driver's

license.").  As noted above, however, such contentions are hypothetical and, in light of the trial record, farfetched.

PK also elicited testimony from Valente and Aydin that bills of lading could be and had been changed after their creation, Tr. 4/26/18 at 65:12–17 (Valente); Tr. 4/26/18 at 184:24–185:2 (Aydin), in an attempt to show that UMEC could also have framed PK by altering the bills of lading before they were included in Joint Exs. 101–113.   However, Spaight (the terminal manager and the one responsible for making any such changes) testified credibly on redirect that such changes are "very infrequent" occurrences and that the Toptech system would contain a record of any change that had been made, Tr. 4/26/18 at 209:22–210:3, no record of which was introduced.

In addition to attempting to demonstrate that UMEC had the capacity to alter records, PK sought to demonstrate UMEC's propensity to engage in such a scheme by introducing evidence of the bad character of Michael Scafura, the former comptroller of UMEC's predecessor company and currently an employee of UMEC, who was involved in UMEC's investigation of the over-lifting.  Tr. 4/26/18 at 9:12–20:14; Tr. 4/27/18 202:15–203:7.   PK introduced evidence that Scafura had pleaded guilty to felony bank fraud in connection with false borrowing base certificates issued by UMEC's predecessor.  Tr. Scafura Dep. 4/15/16, at 34:25–41:21; Joint Ex. PP (guilty plea).   PK also introduced evidence to show that Mr. Scafura was involved in UMEC's investigation of the missing fuel.  *E.g.*, Tr. Scafura Dep. 4/15/16 at 66:16–21; Joint Exs. QQ, RR, SS, WW, YY, ZZ, AAA, BBB, UUU, VVV, WWW, YYY, ZZZ, AAAA, KKKK, LLLL (emails).  The involvement of a convicted felon in UMEC's internal investigation -- and even his direct involvement in initially calculating the discrepancy between the UMEC oil lifted and the payments to UMEC -- does not outweigh the credible testimony of multiple non-

felonious witnesses that Joint Exs. 101–113 are what they purport to be:  accurate, unaltered records of the bills of lading generated by the Toptech system through the use of PK Access Cards.

This is a civil action subject to a preponderance of the evidence standard; to prevail, UMEC must show that it is more likely than not that PK breached the relevant contracts.  PK has at times treated it, however, like a criminal case, attempting to introduce a sliver of reasonable doubt by establishing the possibility that UMEC actually engaged in a plot to siphon off its own oil and blame PK, rather than sell it to its customers, or, perhaps, to fake the loading of its oil. But PK's alternate theories of how the oil went missing are speculative at best.  PK was not able to impeach the reliable testimony of multiple witnesses that the bills of lading generated by the Access Card/Toptech system accurately reflect the amount of fuel lifted using PK Access Cards.

  ii.    ___UMEC is Entitled to Rely on PK's Own Calculation of Total Deliveries.___

UMEC introduced two exhibits to support its contention regarding the actual amount of fuel oil delivered by PK to UMEC's customers during the relevant period.  Joint Ex. 138 contains all of UMEC's delivery tickets for PK through October 17, 2014; Joint Ex. 80 is a summary of deliveries to UMEC's customers prepared by PK.  *See* Valente Decl. ¶¶ 86–87.  In addition, Joint Ex. 130 is a chart prepared by UMEC comparing the total deliveries as calculated by PK in Joint Ex. 80 with the total deliveries reflected in Joint Ex. 138.  Valente Decl. ¶ 87.  As noted above in note 12, for purposes of this dispute, UMEC has agreed to adopt PK's calculation of total deliveries, which exceeds UMEC's own calculations and thus favors PK.  UMEC summarized this information, along with the bills of lading, in Joint Exs. 131 and 132, as discussed above, and PK has not challenged the accuracy of such summaries pertaining to PK's

deliveries.  Accordingly, the Court relies on those calculations in concluding that UMEC has not

been paid for 457,431.8 gallons of fuel oil lifted onto PK's trucks using PK Access Cards.

### iii.   *Other Circumstances Surrounding PK's Deliveries Support UMEC'S Claim that PK's Drivers Were Over-lifting.*

In addition to the reliable raw data, both parties introduced additional evidence intended

to show or refute that over-lifting was attributable to PK's drivers.  Thus UMEC introduced Tom

Tom/GPS driving records for PK's trucks between October 1, 2013 and October 31, 2014 that

contained a significant number of rides listed as "private trip."  Joint Ex. 139.  Gonzalez testified

on cross examination that such private trips reflect rides simply for which the driver did not turn

on the Tom Tom/GPS for navigation.  Tr. 4/26/18 at 283:23–284:3 ([Mr. Gonzalez]:  "There's a

definition for private trips.  How the GPS works is if I know that going to Central Avenue I have

to take Martin Luther King into Central Avenue I don't need to plug in on the GPS where I'm

going.  I just go.").  Gonzalez further testified that there are two forms of records generated by

the TomTom/GPS tracking system used by PK:  records viewed on the day of the trip, which

include the full details of private trips, and monthly reports generated after the fact that list only

the existence and duration of such trips.  Tr. 4/26/18 at 283:15–20 ("[W]e cannot see the private

trip . . . when we pull up the data, but on the day of we can see the private trip.  We can see

where he went.  But when we pull up the data a month or two months later we don't see the

private trip because there's two parts of the software.  Either you want to pull out what he did

that day or you want to see where the truck went that day.").  UMEC's argument that the private

trips could occasions during which PK's drivers offloaded excess fuel is plausible based on this

testimony, which did not really suggest that the trips could be shown to be authorized deliveries,

and thus lends additional support to UMEC's position that PK trucks lifted the excess oil.

At trial, Gonzalez testified for the first time on redirect that his regular review of various PK business records would have shown any discrepancy between the delivery tickets assigned to PK and the amount of oil offloaded by PK's drivers, and that his failure to observe any such discrepancy is evidence that UMEC's calculation of the total bills of lading and/or of the total delivery tickets must be wrong. Gonzalez first testified that PK's trucks contain a meter which must be turned on to dispense oil and which creates a stamped record on a delivery ticket showing (a) the amount of oil dispensed at that time, (b) the total amount of fuel dispensed through that meter for all time, and (c) a sequential number indicating the order in which such stamps were generated. Tr. 4/27/18 at 23:9–33:14. The delivery tickets entered as Joint Ex. 138 reflect these stamps. Gonzalez's testimony established that this meter system was put into place in response to events in February 2013 when it appears that someone diverted fuel on PK trucks. Tr. 4/27/18 at 17:8–14. PK also elicited testimony from Besar Haxhaj, a former PK driver, to the effect that PK's trucks could not dispense fuel without the meter being active. Tr. 4/27/18 at 140:8–9 ("You have to start the meter before you can deliver anything.").

Next, Gonzalez testified that on a daily basis he or his wife entered each delivery ticket and stamp into a Microsoft Excel spreadsheet, first to ensure that all of the delivery tickets were stamped in sequential order (*i.e.*, that all fuel dispensed was attributed to delivery tickets) and second to compare the total dispensed fuel to the bills of lading for that day in order to reconcile the two. Tr. 4/27/18 at 34:6–39:9. Gonzalez testified that he or one of PK's drivers would return the delivery tickets to UMEC along with a printout of the Excel spreadsheet on a daily basis, *but* that he did not have any copies of such reconciliations nor his own records of the Excel spreadsheets to provide as evidence. Tr. 4/27/18 at 39:19–43:15. Gonzalez's testimony on this point is not credible in light of PK's inability to (a) dispute the accuracy of particular delivery

33

tickets or bills of lading, (b) produce any supposed reconciliations, or (c) provide even the form

of Excel spreadsheet that he and his wife ostensibly used to perform these daily reconciliations.

PK's counsel argued at trial that its failure to introduce the reconciliations themselves

was actually UMEC's fault and should not be held against PK because such reconciliations were

"clearly within [PK's discovery] demands."  Tr. 4/27/18 at 43:19.  If PK was concerned that

UMEC had these documents and failed to produce them, however, it could have raised that issue

at some point in the three years this case has been pending, especially since Gonzalez ostensibly

created them himself and thus ostensibly was fully aware of their existence.  In any event,

Gonzalez's testimony that he would have noticed a discrepancy as it occurred does not overcome

the reliable evidence that PK lifted several hundred thousand gallons more of UMEC fuel oil

than UMEC was paid for.

### C.  The Court Accepts UMEC's Damages Calculation.

To calculate PK's obligation to UMEC for over-lifted oil, UMEC used the average price

of fuel over the entire relevant period.  Valente Decl. ¶ 91.  The Court asked the parties to submit

post-trial briefing on, among other things, the appropriateness of this calculation in light of

Paragraph 9.d. of the Terminal Access Agreement, which reads:

> Customer/Carrier shall pay UMEC the value of any Products lost, stolen, or
> unaccounted for at the Terminal and charged or obtained by means of the
> misappropriation or unauthorized use or duplication of any Access Card issued to
> Customer/Carrier under this Agreement.  *In the absence of a separate written
> agreement with UMEC specifying the price of Products charged to
> Customer/Carrier's account number(s) at the Terminal, the value of such lost,
> stolen or misappropriated Products will be the price of such Products in effect at
> the Terminal on the date of the loss, theft or misappropriation.*

(Emphasis added.)  In response, UMEC explained the basis for using an average fuel price for its

damages calculation based upon the average prices listed in UMEC's invoice to PK dated

October 28, 2014 for the missing fuel through October 14, 2014.[41]   UMEC then adjusted this number to reflect a credit for the decrease in shortfall achieved by PK between October 14, 2014 and October 31, 2014.[42]   To calculate this credit, UMEC adopted PK's account of the additional deliveries made over this period (191,705.2 gallons)[43] and multiplied this number by the average price reflected on the foregoing invoice ($3.3867/gallon), for total damages of $1,549,191.37.[44]   UMEC argues that its calculation of damages is reasonable in the absence of specific invoices tied to specific deliveries/non-deliveries, because it is impossible to know which specific withdrawals of fuel by PK drivers were and were not delivered to UMEC's customers.[45]

On the other hand, PK and Gonzalez did not take up the Court's invitation to submit a damages calculation, instead relying solely on the Additional Documents to reargue the issue of total deliveries.   Nor have they disputed UMEC's damages methodology or calculations.   Under the circumstances, UMEC's uncontroverted averaging approach is reasonable.

### 2.   UMEC Has Not Established PK's Liability on a Conversion Theory

A conversion takes place when one intentionally and without authority assumes or exercises control over personal property belonging to another, interfering with that person's right of possession.   *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49–50 (N.Y. 2006).   As a claim against the Debtor's estate, UMEC's conversion theory of recovery is subject to the same burden-shifting framework as its breach of contract theory.   In connection with UMEC's breach of contract claim it has already been established that excess fuel oil was lifted from the Greenpoint Facility using PK Access Cards.   The parties do not dispute that such oil

---

[41] UMEC Post-Trial Brief at 12; Joint Ex. 77.
[42] UMEC Post-Trial Brief at 12.
[43] Joint Ex. 80.
[44] UMEC Post-Trial Brief at 12-13.
[45] *Id.* at 13 n. 3: "[A]ny attribution of these gallons to particular dates would be random."

was UMEC's property and that PK was not authorized to lift the excess oil. Thus the remaining question is whether PK intentionally assumed or exercised control over the over-lifted oil.

Gonzalez's testimony that all oil picked up by PK from the Greenpoint Facility was delivered to UMEC's customers (Gonzalez Decl. ¶¶ 21–24), and that he as PK's principal was "unaware that any excess fuel had been lifted," (Gonzalez Decl. ¶ 24) is evidence that, if credited, would negate these elements. Indeed, Gonzalez has consistently maintained, until the Motion to Reopen, that "[t]he only reasonable explanation is that someone else picked up oil from United Metro under Petroleum Kings' name." Gonzalez Decl. ¶ 21. While this version of events would not negate PK's liability under the parties' contracts unless UMEC itself did the over-lifting (which the Court has not found), it would preclude liability on an intentional tort theory. Accordingly, the burden shifts to UMEC to show by a preponderance of the evidence that PK intentionally exercised control over the over-lifted oil. This UMEC has not done.

UMEC attempted to show that PK drivers *qua* PK drivers, rather than third-party drivers armed with PK's Access Cards or PK drivers without authorization from PK, lifted the excess oil by Valente's testimony regarding the security of the Greenpoint Facility, including the locked gate surrounding the facility and the need to use individualized PINs to obtain fuel from the loading dock. *See* Valente Decl. ¶¶ 24, 43. As noted above, however, on cross examination PK elicited testimony from Valente and Aydin that the PINs used at the Greenpoint Facility in connection with the Access Cards were merely the last four digits of each driver's license number. Tr. 4/26/18 at 54:5–13 (Valente); Tr. 4/26/18 at 187:11–17 (Aydin), a relatively public piece of information. In addition, Besar Haxhaj, a former PK driver, testified that, in his

36

experience, the gate that generally required an Access Card to enter the Greenpoint Facility was frequently left open. Tr. 4/27/18 at 135:9–15, 136:12–16.[46]

More importantly, UMEC did not introduce evidence to show that PK directed its drivers to over-lift. Spaight testified that he had "never seen any drivers that [he] did not recognize load fuel into Petroleum Kings trucks," Spaight Decl. ¶ 11, but this suggests only that it was PK drivers -- with or without authority from PK -- who lifted the excess oil. Moreover, on cross examination Spaight admitted that it is not his practice to closely observe the drivers as they load oil, and that there "certainly could've been drivers [he] wouldn't have known." Tr. 4/26/18 at 201:22–24. UMEC therefore has not met its burden to show by a preponderance of the evidence that PK itself intentionally over-lifted fuel.

This conclusion is bolstered by evidence submitted by UMEC itself regarding an earlier misuse of Access Cards by a PK employee, Andres Salazar, who improperly delivered UMEC oil to third parties. *See* Joint Exs. 11, 12; Tr. 4/27/18 at 16:22–17:25. Upon discovering Salazar's recurring misconduct, PK terminated his employment, informed UMEC, and represented to UMEC that Salazar "ha[d] surrender[ed] all of the loading cards." Joint Ex. 12. Against this background, and in part because Gonzalez's testimony regarding his purported practice of conducting daily reconciliations was not credible, it is at least as likely that, rather than engaging in a scheme to take UMEC oil and intentionally deliver it to non-UMEC customers, PK was unaware of the unauthorized use of its Access Cards by its employees or third parties. Indeed, the evidentiary record includes emails between Gonzalez and various UMEC employees from which it appears that Gonzalez on at least one occasion neglected to

---

[46] Spaight testified on cross examination that UMEC's practice was to leave the gate closed when it was broken and require it to be opened manually by an attendant, Tr. 4/26/18 at 191:1–8, but in light of Spaight's duty station being away from the actual gate, Haxhaj's testimony is equally credible.

inform UMEC of lost, missing, stolen or destroyed cards at the time of their loss or destruction. Joint Exs. 18, 19, 20, 21, 44.

### 3. UMEC is Not Entitled to Punitive Damages

UMEC has also requested punitive damages for PK's conduct in this case. Under New York law, to obtain punitive damages in connection with a breach of a contract, a plaintiff must establish that (i) the defendant's conduct is actionable as an independent tort, (ii) the tortious conduct must be egregious by the standard set out in *Walker v. Sheldon*, 10 N.Y.2d 401, 404–05 (N.Y. 1961), (iii) the egregious conduct was directed at the plaintiff, and (iv) the egregious conduct was part of a pattern directed at the public generally. *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316 (N.Y. 1995). To justify punitive damages under the *Walker* standard, the wrong complained of must be "morally culpable, or . . . actuated by evil and reprehensible motives." *Walker*, 10 N.Y.2d at 404. An alternate formulation is that punitive damages are appropriate "where the defendant's conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations." *Id.* at 405. Because PK is not liable on a conversion theory, and because UMEC has not raised any other theory sounding in tort, punitive damages therefore are not available here. Moreover, there is nothing in the record to suggest that, even if PK intentionally misappropriated UMEC's fuel oil, it did so as "part of a pattern directed at the public generally."

### 4. PK is Entitled to Its Claimed Offset.

PK has asserted that it is entitled to $34,712.29 for the delivery services it provided UMEC before the parties' business relationship was terminated, and has adequately supported

this claim on an account stated[47] theory with invoices directed to UMEC dated between May 31, 2014 and November 30, 2014.

PK has also asserted that it is entitled to $159,586.95 in reimbursement for oil that it purchased from Sprague for delivery to UMEC customers, again on an account stated or *qantum meruit* theory, and, at trial, UMEC's counsel appeared to admit that both amounts sought were "appropriate offsets" to be deducted from any eventual award to UMEC. Tr. 4/27/18 at 192:18–19: [Mr. Wagner]: "So I agree from the 450 -- from the million five you do have to deduct those two amounts." [The Court]: "Okay. They haven't already been deducted?" [Mr. Wager]: "No. They're not in the calculation." However, UMEC's Post-Trial Brief walks back on this, stating that "UMEC's calculations already gave [PK] credit for that reduction in shortfall."[48] The Court disagrees and believes that given the concession at trial PK should not be put to additional proof on this issue, which UMEC did not attempt to controvert until its Post-Trial Brief, and even then without an adequate showing. Accordingly, PK has a claim of $194,299.24 that it may set off against UMEC's Claim No. 6.

**5. UMEC is Entitled to Prepetition Prejudgment Interest at the New York Statutory Rate Against PK and Is Not Entitled to Attorneys' Fees Against PK.**

UMEC asserts that under New York Civil Practice Law & Rules ("CPLR") § 5001 it is entitled to prejudgment interest on the amout owing to it. That statute generally makes prejudgment interest mandatory on "a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or

---

[47] An account stated represents an agreement between the parties reflecting amounts due on prior transactions. *M & A Constr. Corp. v. McTague*, 21 A.D.3d 610, 611 (N.Y. App. Div. 3d Dep't 2005). Thus, "[a]n essential element of an account stated is that the parties came to an agreement with respect to the amount due." *Episcopal Health Servs., Inc. v. POM Recoveries, Inc.*, 138 A.D.3d 917, 919 (N.Y. App. Div. 2d Dep't 2016). "[W]hile the mere silence and failure to object to an account stated cannot be construed as an agreement to the correctness of the account, the factual situation attending the particular transactions may be such that, in the absence of an objection made within a reasonable time, an implied account stated may be found." *Interman Indus. Prods. v. R.S.M. Electron Power, Inc.*, 37 N.Y.2d 151, 154 (N.Y. 1975).

[48] UMEC Post-Trial Brief at 17.

possession or enjoyment of property."  PK asserts, however, citing cases under federal law, that the decision whether to award prejudgment interest is in the Court's sole discretion.

CPLR § 5001 generally comes into play in federal court under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) and its progeny, which provide that a federal court sitting in diversity applies federal procedural law and the forum state's substantive law.  It is established law in this Circuit that the availability of prejudgment interest is a matter of substantive law for *Erie* purposes.  *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir. 1999);  *see also Washington v. Kellwood Co.*, 2016 U.S. Dist. LEXIS 28012, at *5–6 (S.D.N.Y. Mar. 4, 2016) ("When adjudicating federal claims, federal courts enjoy wide discretion in fashioning an appropriate judgment with regards to the amount and method of calculation of prejudgment interest.  But that discretion dissipates when a federal court adjudicates a state law claim.") (internal quotation marks and citations omitted).  And just as a district court sitting in diversity is required under the *Erie* doctrine to apply state substantive law, it is well established that state law provides the substantive rules of decision for a court determining the nature and amount of state law claims under the Bankruptcy Code.  *Leading Mfr. Pte. Ltd. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.)*, 313 B.R. 565, 570 (S.D.N.Y. 2004).  Accordingly, New York substantive law (including CPLR § 5001) governs the amount of UMEC's claims.

With exceptions not relevant here, statutory interest under New York law accrues as simple interest at a rate of "nine per centum per annum."  CPLR § 5004; *see also Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998).  CPLR § 5001(b) states that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred.  Where such damages were incurred at various times, interest shall be computed upon each item from the date

it was incurred or upon all of the damages from a single reasonable intermediate date." Because of the inability to discover which precise withdrawals of fuel constituted the over-lifting, October 14, 2014 -- the date of UMEC's first notice to PK that there had been over-lifting -- is a reasonable intermediate date for mandatory prejudgment interest on UMEC's claim to begin to run.

However, while prejudgment interest ordinarily runs until the date of judgment, UMEC is not entitled to claim such interest against PK after the commencement of PK's chapter 11 case on February 2, 2017. Without additional facts, which UMEC has not alleged, a claim for such postpetition interest is disallowed under 11 U.S.C. § 502(b)(2).[49] The application of state law to determine a creditor's claim in a bankruptcy case is "subject to any qualifying or contrary provisions of the Bankruptcy Code," *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000), including section 502(b)(2)'s disallowance of claims "for unmatured interest."

Nor is UMEC entitled to collect its attorneys' fees from PK. It has not identified any contract provision that would give rise to such a claim with the exception of an indemnity in ¶ 6 of the Terminal Access Agreement for loss to third parties, including attorneys' fees, which is insufficient to overcome the American Rule against an award of attorneys' fees.

To summarize, before the set off of PK's claim, UMEC holds a claim against PK for $1,549,191.37 in compensatory damages. CPLR §§ 5001 and 504 mandate an award of simple interest at a rate of 9% on this claim from October 14, 2014 until February 2, 2017.

6.  **PK is Entitled to Prejudgment Interest at the Statutory Rate on its $194,299.24 Setoff Claim.**

---

[49] UMEC nevertheless would be free to allege exceptions to section 502(b)(2)'s disallowance of unmatured interest if facts develop to justify them.

41

PK's claim is likewise covered by CPLR § 5001.   Accordingly, PK is entitled to prejudgment interest at a simple rate of 9% per annum calculated from October 31, 2014 to date.[50]

### 7.   UMEC is Entitled to Judgment Against Gonzalez Under the Guaranty for All Amounts Owed UMEC by PK.

Under ¶ 1 of the Guaranty, Gonzalez guarantied "prompt payment, and not merely collection . . . to UMEC when due of any and all obligations of [PK] to UMEC, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereinafter arising or acquired and in whatever form."   Accordingly, Gonzalez is obligated under the Guaranty for all amounts owed by PK to UMEC before PK's setoff.

### 8.   UMEC is Entitled to Attorney's Fees from Gonzalez Under the Guaranty Agreement

The Guaranty provides that Gonzalez "unconditionally guarantees . . . prompt payment . . . of any and all obligations of [PK] to UMEC . . . together with all interest thereon *and all reasonable attorneys' fees, costs and expenses of collection incurred by UMEC in enforcing any such obligation or in enforcing this Guaranty against [Gonzalez]*."   Guaranty ¶ 1 (emphasis added.)   Accordingly, UMEC is entitled to judgment against Gonzalez not only for PK's obligation to UMEC, but also for UMEC's reasonable attorneys' fees incurred in the course of this litigation.   UMEC is directed to promptly file and serve an application, supported by detailed time records, for an award of attorneys' fees to be entered against Gonzalez alone and schedule a hearing on the reasonableness of such claim.

---

[50] Because UMEC is not in bankruptcy, no petition date applies to cut off UMEC's liability for prejudgment interest.

## **Conclusion**

For the foregoing reasons, after the Court's determination of the amount of UMEC's attorneys' fee claim under the Guaranty, UMEC shall settle a proposed judgment on PK and Gonzalez consistent with this Memorandum of Decision.

Dated: White Plains, New York
October 9, 2018

/s/Robert D. Drain
United States Bankruptcy Judge